## UNITED STATES v. PIERCE COUNTY et al.

(District Court, W. D. Washington, S. D.    February 10, 1912.)

### No. 1,637.

TAXATION (§ 5*)—PROPERTY OF UNITED STATES—TIME OF ACQUISITION.

Under Laws Wash. 1903, p. 339, § 63, which provides that taxes shall be levied by the board of county commissioners at the October session of each year, and Laws Wash. 1903, p. 74, § 83, which provides that taxes assessed on real property shall be a lien thereon from March 1st in the year they are levied, but as between grantor and grantee shall not attach until the first Monday of February of the succeeding year, real property acquired by the United States in May and July was not subject to the tax of that year.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 17; Dec. Dig. § 5.*]

In Equity. Suit by the United States against Pierce County, Wash., and another, to cancel a purported tax lien. Decree for complainant.

Elmer E. Todd, U. S. Atty.

J. L. McMurray and J. T. S. Lyle, for defendants.

DONWORTH, District Judge. This is a suit in equity, brought to cancel and annul a purported tax lien for the state, county, school, and city taxes of the year 1903 on lots 1, 2, 3, 4, 7, 8, 9, and 10 in block 1102 of the city of Tacoma, which lots, together with the other four lots in the same block, constitute the site upon which stands the building constructed by the United States for a post office, courthouse, and custom-house in that city, and now used for those purposes. A final hearing has been had on the bill, answer, and an agreed statement of facts. By act of Congress approved June 6, 1902 (32 Stat. 320, c. 1036), an appropriation was made for the acquisition of a site and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

the construction of a government building at Tacoma. Shortly thereafter negotiations were begun between the Secretary of the Treasury and certain persons controlling this block of land, with the result that the Secretary on December 22, 1902, wrote to the parties in interest definitely accepting, on certain conditions, their proposition to sell the entire block to the government. Lots 5, 6, 11, and 12 were conveyed to the government by deeds made in January, 1903. Lots 1, 2, 3, 4, 7, and 8 were conveyed to the government by deeds executed in May, 1903, and recorded in the deed records of the county in July of the same year. For lots 9 and 10 condemnation proceedings were instituted by the government, and all persons having any interest (including Pierce county) were brought into the action as parties respondent. The county made no appearance. The proceedings resulted in a decree of appropriation in favor of the government, rendered July 10, 1903, and recorded in the county records on August 17, 1903. All of the 12 lots composing the block were entered on the county assessment rolls for general taxation for the year 1903, and the ordinary taxing proceedings were had, ignoring the transfer of title to the United States. The tax against the entire block amounted to $798.74. Later the county commissioners ordered a cancellation of the taxes purporting to be assessed against lots 5, 6, 11, and 12, presumably for the reason that those lots appeared to have been conveyed to the government prior to March 1, 1903. The tax purporting to stand against the other 8 lots was $560.90. For this amount, together with accrued interest, the defendants claim that the property is still subject to a valid lien for the taxes of 1903.

The general taxation law of the state of Washington provides in section 63 (Laws 1903, p. 339) that for the purpose of raising a revenue for the state, county indebtedness, county current expense, school, road, and other purposes, the board of county commissioners shall, at the October session of each year, levy a tax on all taxable property in the county, as shown by the assessment roll, sufficient for such purposes. Section 83 of the same law (Laws 1903, p. 74) is as follows:

"Sec. 83. The taxes assessed upon real property shall be a lien thereon from and including the first day of March in the year in which they are levied until the same are paid, but as between a grantor and grantee such lien shall not attach until the first Monday of February of the succeeding year. The taxes assessed upon personal property shall be a lien upon all the real and personal property of the person assessed, from and after the date upon which such assessment is made, and no sale or transfer of either real or personal property shall in any way affect the lien for such taxes upon such property."

It is the contention of the county attorney that under these two sections, although the actual levy of the tax takes place in October, such levy is made by operation of law to relate back to March 1st and is to be considered for all purposes as if made at that time. This view finds support in the decisions of the Supreme Court of Washington in Klickitat Warehouse Company v. Klickitat County, 42 Wash. 299, 84 Pac. 860, and City of Puyallup v. Lakin, 45 Wash. 368, 88 Pac. 578, though these cases construe only that portion of section 83 re-

lating to taxes on personal property, which fixes the time of "assessment," and not any particular date, as the time for the attaching of the lien. The present case, however, presents an element not involved in either of those cases. The Constitution of the United States (art. 1, § 8) confers on the government of the United States the right—

"to exercise exclusive legislation in all cases whatsoever * * * over all places purchased by the consent of the Legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards and other needful buildings."

The consent contemplated by these provisions was given by the state of Washington by the act of January 23, 1890 (Laws 1890, p. 459), in the first section of which is enacted:

"That the consent of the Legislature of the state of Washington be and the same is hereby given to the purchase, by the government of the United States or under the authority of the same, of any tract, piece or parcel of land from any individual or individuals, bodies politic or corporate, within the boundaries of this state, for the purpose of erecting and maintaining thereon armories, arsenals, fortifications, magazines, navy yards, dockyards, custom-houses, lighthouses and other needful public buildings or establishments whatsoever; the consent herein and hereby given being in accordance with the provisions of the seventeenth clause of the eighth section of the first article of the Constitution of the United States, and with the acts of Congress in such cases made and provided."

By article 26 of its Constitution the state of Washington entered into an irrevocable compact with the United States, in accordance with the provisions of the law for the admission of the state into the Union, in which it is agreed:

"That no tax shall be imposed by the state on lands or property therein, belonging to or which may be hereafter purchased by the United States or reserved for use."

Aside from such compact, the instrumentalities of the government of the United States are not taxable, without its consent, by any state authority; this rule being the necessary result of our dual form of government.

In the case of lands acquired by the United States for needful public buildings, with the consent of the state Legislature, as is the situation here, the national Constitution withdraws such "places" entirely from the jurisdiction of the state immediately upon their purchase by the general government. The determinative question in the present controversy, therefore, is whether the taxes in question were imposed before or after the acquisition of the property by the United States. If they were imposed before, they would continue to constitute a valid lien on the premises, though even in such case the acquisition of the property by the general government would withdraw it from the jurisdiction of all state officers, and resort for the enforcement of any lien thereon would have to be had to the tribunals of the United States. A subsequent tax sale by state officers, even for a valid tax, would be void.

"When the title is acquired by purchase, by consent of the Legislatures of the states, the federal jurisdiction is exclusive of all state authority. This follows from the declaration of the Constitution that Congress shall

have 'like authority' over such places as it has over the district which is the seat of government; that is, the power of 'exclusive legislation in all cases whatsoever.' Broader and clearer language could not be used to exclude all other authority than that of Congress; and that no other authority can be exercised over them has been the uniform opinion of federal and state tribunals and of the Attorneys General. The reservation which has usually accompanied the consent of the states that civil and criminal process of the state courts may be served in the places purchased is not considered as interfering in any respect with the supremacy of the United States over them, but is admitted to prevent them from becoming an asylum for fugitives from justice. And Congress, by statute passed in 1795, declared that cessions from the states of the jurisdiction of places where lighthouses, beacons, buoys, or public piers were or might be erected, with such reservations, should be deemed sufficient for the support and erection of such structures, and if no such reservation had been made, or in future cessions for those purposes should be omitted, civil and criminal process, issued under the authority of the state or of the United States, might be served and executed within them. [Act March 2, 1795] 1 Stat. 426, c. 40." Railroad Co. v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264; Martin v. House (C. C.) 39 Fed. 694.

In case, however, the tax was imposed after the acquisition of the property by the United States, it is wholly null and void. I think it was so imposed. Consideration of numerous sections of the taxation law of the state of Washington and of the general scheme embodied in those sections makes it plain that March 1st is fixed as the arbitrary date for the beginning of the taxation year. At that time the assessor and his deputies begin their task of valuing all the property in the county, fixing the valuation as of that date. The actual valuation necessarily consumes the work of a number of men for several months. On completion of the assessment it is submitted to the board of equalization, which meets in August, and it is subject to entire revision by that body. Still later the corporate authorities of the several cities, towns, and school districts determine upon the amount of revenue needed for their respective purposes, and in October the board of county commissioners, and the other authorities on whom the statute has conferred the taxing power, levy the tax. While I entertain no doubt that it is within the power of the state to treat the entire taxation proceeding as having been taken at some definite date, so far as concerns the general mass of property (as held by the Supreme Court of Minnesota in State v. Northwestern Tel. Exchange Co., 80 Minn. 17, 82 N. W. 1090), a different rule must apply to property which, while the taxation proceeding is still incomplete, passes under the dominion and exclusive jurisdiction of the United States. The transfer of title to the United States operates to withdraw the property from all the effects of subsequent state action and subjects it to the sole jurisdiction of the United States. As to such property all incomplete state proceedings must fall. To hold otherwise would be to hold that boards of equalization, boards of county commissioners, and city councils can meet and deliberate as to the valuation for taxation purposes of property over which the government of the United States is vested with the power of exercising "exclusive legislation in all cases whatsoever," and can by their votes and proceedings determine how large or how small a tax such property shall be

required to pay. It is too plain for argument that, without an order levying the tax and fixing its rate, no tax could be enforced; and it is equally plain in this case that such order was made several months after the United States acquired this property. That order could not operate against property that had passed under the exclusive jurisdiction of the United States. As to such property no tax has been levied.

In the case of Bannon v. Burnes (C. C.) 39 Fed. 892, a question similar to this arose in relation to taxation proceedings against the site of the federal building at Kansas City, Mo. By the city charter the lien for city taxes attached on January 1st, but the levy was not actually made until the third Monday in April. This site was acquired by the United States on April 9th, and it was held not subject to taxation by the city for that year. The court said:

"Be the contention of plaintiff's counsel correct, that the lien of the city government on this property, so far as the owner and all other persons concerned, attached on the 1st day of January, 1879, yet under the city charter (section 4, art. 6) the fiscal year begins on the third Monday in April, which in 1879 was the 21st day of April. The assessment is made between the 1st day of January and the third Monday in April, and is delivered to the council at its first meeting of the fiscal year. The council then by ordinance proceeds 'to levy taxes for the fiscal year.' A copy of this, with the assessment books, is delivered to the auditor, who then extends the taxes, and delivers the tax book to the collector on the 1st day of May. Sections 20, 21. From which it is manifest that the taxes for the year 1879 were not levied until after the 9th day of April, and after the United States had acquired title to the property by purchase. The mere fact that the property owned on the 1st day of January became liable to taxes for that fiscal year would not avail for the purpose of taxation, without an assessment and levy. Taxes not assessed or levied can never become an effectual lien. Heine v. Commissioners, 19 Wall. 659, 22 L. Ed. 223; Greenough v. Coal Co., 74 Pa. 486–500; Black, Tax Titles, par. 43. The state, by the act of cession, covenanted, in effect, that when the government should purchase this property it would not thereafter make any levy. * * *"

In the case at bar, further support for the position that the tax lien did not attach is found in the provision of the statute that "as between a grantor and grantee such lien [of the taxes on real property] shall not attach until the first Monday in February of the succeeding year," and the United States became the grantee long before that date.

I see no escape from the conclusion that the tax proceedings shown here would, if sustained, impose a tax upon property of the United States, and that such proceedings were beyond the power of the state authorities, and were therefore void.

A decree will be entered granting the relief prayed for.